UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

       Plaintiff,    CASE NO:  8:13-cr-00048-JSM-TBM

v.

WARREN GOLD,
AIGOUL IPLAEVA GOLD,
RIMMA ANASOVNA MAMLEEVA,
JOHN BUSTER QUICK,
RAJAN KANDA VANAM RAJ, and
JOHN ALLEN LANNING

       Defendants.
_____/

## SENTENCING MEMORANDUM OF AIGOUL GOLD

  The Defendant, AIGOUL GOLD, by and through undersigned counsel, hereby files this Sentencing Memorandum. As the Court is aware from the Presentence Investigation Report (PSR), Mrs. Gold's count of conviction (conspiracy to engage in money laundering and transactions involving the proceeds of specified unlawful activity) is a Class C felonies. The PSR's recommendation of a Guidelines sentence of 97 months to 121 months places Mrs. Gold in Zone D. For the reasons that follow, it is respectfully requested that this Court depart or grant a substantial variance and impose a sentence below the advisory Guideline range.

## BACKGROUND

  The Presentence Investigation Report outlines Mrs. Gold's personal history and as it notes, Mrs. Gold is a caring and loving mother and wife. Mrs. Gold was born in Russia and moved to the United States in 1997. She became a Naturalized Citizen on January 25, 2007. In December 2005, Mrs. Gold married her current husband, Warren Gold. The couple have three

children together, two girls and a boy. Prior to becoming involved in pain management clinics, Mrs. Gold worked in the financial field, including working for a bank and a marketing company. In 2009, Mrs. Gold operated a telemarketing company which was closed in 2010.

In 2009, while her husband was operating a used car dealership United Auto Finance (UAF), they noticed the significant business traffic associated with a pain management clinic next door to her husband's car dealership, Superior Pain Clinic ("Superior"). Curious about the business, Mrs. Gold's husband approached the owners and discussed with them the operations and the process of operating a pain management clinic. Mr. and Mrs. Gold learned from the owners of Superior how to operate a pain management clinic.

At this time, Mrs. Gold met Dr. Allen Lanning, who worked at Superior and was presented to Mrs. Gold as an experienced pain management doctor with outstanding credentials. Dr. Lanning was a combat surgeon for the Navy and had spent 40 years in private medical practice. Dr. Lanning began to focus on the treatment of pain management in 2008. First, by working as an initial intake evaluator for First Health, aka 1-800-ASK-GARY and then at Superior. During this time period, Dr. Lanning developed a significant amount of clinical experience in pain management.

In March 2010, with the assistance and direction of the owners of Superior and Dr. Lanning, Mrs. Gold and her husband opened a pain management clinic, 1910 Medical Clinic (the "Clinic"). The Clinic was opened in Bradenton, Florida because Dr. Lanning was hired to be the medical director and he requested the Clinic be opened near his home. Dr. Lanning's responsibilities were to evaluate each patient by reviewing the patient's self-reported history, completing a physical exam, reviewing an MRI if necessary, and requesting blood work. If Dr.

Lanning felt prescription medications were a medically reasonable course of treatment, he would provide such treatment.

With no medical training or experience, Mr. and Mrs. Gold relied completely on Dr. Lanning, as the Clinic's medical director, to develop and implement the appropriate policies and procedures of the Clinic, which included everything from the forms used to the manner in which doctors would be paid. Dr. Lanning also hired Dr. John Quick. Mr. and Mrs. Gold made no medical decisions and offered no advice on the manner in which patients would be seen and treated. They relied exclusively on the doctors hired to make all patient care related decisions. Their role in the Clinic was to manage the business aspects of the company such as hiring, accounting, and investment. Mr. and Mrs. Gold were not permitted to sit in the examination room when doctors were seeing patients.

Approximately one and one half months after opening the Clinic, Dr. Lanning resigned, took all the patient files, and reopened a competing clinic elsewhere in Bradenton. After shutting their doors for a brief period, Mr. and Mrs. Gold appointed Dr. John Quick to act as Medical Director of the Clinic. The Clinic operated in various locations in Central Florida from March 2010 until December 2010 when Mrs. Gold and two of the Clinic's doctors were charged with violations stemming from improper licensing.

At the outset, it was Mr. and Mrs. Gold's intent to operate and manage the pain clinic as a viable and medically necessary business. It was not opened just to sell prescriptions. However, as time went on, Mr. and Mrs. Gold subsequently recognized that the manner in which the Clinic was being run was a violation of the law. As the business continued to develop, Mr. and Mrs. Gold failed to appreciate that the Clinic grew to become more of a "pill mill" and less of a "pain

3

management clinic". As a result, Mr. and Mrs. Gold were charged with the offenses for which they now plead.

Mrs. Gold recognizes that the 10 prescriptions for which she is being held accountable were all provided to undercover law enforcement agents who were seen by co-defendant doctors. It should be noted that there is no claim that the Clinic failed to obtain the appropriate medical records and histories from the undercover agents. These agents received their prescriptions based on the decisions of the doctors. Mrs. Gold, without any medical training, had no way of knowing if the prescriptions provided to the undercover agents were not for a legitimate medical purpose and not in the usual course of proper and professional practice.

**MEMORANDUM OF LAW**

This memorandum addresses the question of what is the appropriate sentence for Mrs. Gold based on her violations of 18 U.S.C. §§ 1956. The memorandum examines the issue of whether a Guidelines sentence is appropriate and whether downward departure is appropriate, and whether a variance from application of the Sentencing Guidelines should be granted pursuant to 18 U.S.C. § 3553(a), notwithstanding the calculation of the sentence determined by the Guidelines.

**I.     The Sentencing Guidelines Cannot Restrict a Court's Discretion**

A district court's discretion is no longer limited by the guidelines since its matrix is now considered merely advisory. *United States v. Booker*, 543 U.S. 220, 245-67. Indeed, it "has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that

4

sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (quoting Koon v. United States, 518 U.S. 81 (1996)).

It is abundantly clear that district courts today enjoy "sizeable discretion" in sentencing. *United States v. Gall*, 552 U.S. at 56; *United States v. Pugh*, 515 F.3d 1189-90 (11th Cir. 2008). Utilization of the Guidelines in a manner other than as an advisory tool violates the Sixth Amendment rights of a defendant. Any contention that the Guidelines enjoy a presumption of reasonableness has been rejected. *See Rita v. United States*, 551 U.S. 338, 351 (2007).

A district court now has the ability and authority to impose a sentence, merely "because the case warrants a different sentence…," regardless of the range determined by a Guidelines calculation. *Id*. The only requirement is that a court consider the Guidelines as a factor along with the other factors delineated in § 3553(a) before reaching its final decision. *Kimbrough v. United States*, 522 U.S. 85 (2007). No extraordinary circumstances need be present nor any mathematical formula employed before a below Guidelines sentence may be imposed. *Gall*, 552 U.S. at 47-58. Judge Tjoflat, writing for the Court in *United States v. Glover*, 431 F.3d 744, 752-53 (11th Cir. 2005), recognized that in some cases, the Guidelines may have little persuasive effect in light of the § 3553(a) factors:

> Although 'judges must still consider the sentencing range contained in the Guidelines , . . . that range is now nothing more that a suggestion that may or may not be persuasive . . . when weighed against the numerous other considerations listed in [Section 3553(a)].'

*United States v. Glover*, 431 F.3d 744, 752-53 (11th Cir. 2005).

Consistent with this, the Eleventh Circuit stated, "there is a range of choices for the district court, and so long as its decision does not amount to a clear error of judgment we will not reverse even if we would have gone the other way had the choice been ours to make." *United States v. Jordan*, 582 F.3d 1239, 1249 (11th Cir. 2009).

A sentencing court, then, has not only the power, but also the responsibility, to mold an appropriate sentence—taking each and every defendant into account as an individual. The sentencing decisions made by this Court trump the Sentencing Guidelines.

## II.     The § 3553 Factors Applied to Mrs. Gold's Case

The goal of sentencing is to impose the least onerous sentence consistent with the purposes of sentencing, which Congress has identified as punishment, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a) (providing that a court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing). To achieve these ends, § 3553(a) requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of the specific case through the lens of seven factors, including:

> (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)    the need for the sentence imposed
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3)    the kinds of sentences available;
>
> (4)    the kinds of sentence and the sentencing range established . . .;
>
> (5)    any pertinent [Sentencing Commission] policy statement . . .;
>
> (6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7)    the need to provide restitution to any victims of the offense.

Against this backdrop of factors, a variance based on the § 3553(a) factors is warranted in Mrs. Gold's case.

### 1. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Mrs. Gold is married to co-defendant Warren Gold. She has three children, two girls, 11 and 9, and a boy, 1. Her son, Aden, suffers from significant medical issues related to his body's inability to properly digest and process nutrients.

Throughout her life, Mrs. Gold has shown significant personal accountability and responsibility. Most evident of this is the fact that Mrs. Gold returned to the United States from Russia for the specific purpose of pleading to the allegations in the indictment and voluntarily submitting himself to the jurisdiction of this Court. This voluntary return is significant in that while in Russia Mrs. Gold was not subject to extradition and could have remained there, outside the reach of the United States had she chosen.

The sole "blemish" on Mrs. Gold's personal history relates to an alleged claim of theft from her employer when she was 21 years. At the time, Mrs. Gold determined that it was in her best interest to enter into a pretrial diversion program. Mrs. Gold completed the program successfully and the case against her was dismissed.

The nature and circumstances of the offense and the history and characteristics of Mrs. Gold establish the appropriateness of a variance. As discussed supra, prior to forming the Clinic, Mrs. Gold worked in the financial industry. She had no experience in the medical field and no experience in running a pain management clinic. Nevertheless, Mr. and Mrs. Gold consulted with the owners of Superior and hired Dr. Lanning as Medical Director to establish and create the Clinic.

Before opening the Clinic, Mr. and Mrs. Gold consulted with the Florida Department of Health, medical attorneys, and any governing agency they thought might have jurisdiction over the Clinic in an effort to ensure the manner in which they operated was appropriate and legal. At the time they opened the Clinic, Mr. and Mrs. Gold intended to operate it in a manner consistent with appropriate medical responsibilities. Mr. and Mrs. Gold also paid for the doctors of the Clinic to attend pain management seminars so that they would be aware of the latest trends in pain management practice including identification of the latest rules and regulations required for pain management treatment.

Mrs. Gold's responsibilities in running the Clinic were limited to operating the "business". This included employment decisions, financial decisions, and overall office management. Mrs. Gold and her husband put policies and procedures in place to ensure that the doctors were provide all appropriate medical records when they examined a patient. Mrs. Gold relied on the doctors who worked at the Clinic to provide appropriate medical care to the Clinic's patients. Without any medical training, Mrs. Gold could not make an independent determination of whether any prescription was for a legitimate medical purpose.

> **2.** **the need for the sentence imposed -**
> **(A)** **to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;**
> **(B)** **to afford adequate deterrence to criminal conduct;**
> **(C)** **to protect the public from further crimes of the defendant; and**
> **(D)** **to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;**

Section 3553(a)(2)(A) lists as the things for the judge to consider is "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and

to provide just punishment for the offense." A sentence that is excessive in light of the seriousness of the offense promotes disrespect for law and provides unjust punishment.

Mrs. Gold's conduct in this case should be considered slightly less serious as her motives were not entirely egregious. Initially, her intent was to own and operated a pain management clinic. In doing so, she consulted with who she thought to be a successful and legitimate pain management owner and hired a doctor with experience in pain management treatment to act as her Medical Director. As Mrs. Gold has since recognized and accepted responsibility for, this initial legitimate business purpose slowly slid into the illicit business of "pill mill." Mr. and Mrs. Gold did not start the Clinic with the plan of creating a pill mill. On the contrary, they believed that the demand for pain management was so great that operating the Clinic would be profitable under any circumstance. Having relied on Dr. Lanning to help develop the practice and procedures, as well as his continued insistence that a pain management clinic was medically appropriate and necessary for patients with chronic pain, Mrs. Gold operated the Clinic in what she thought was an appropriate manner.

Section 3553(a)(2)(B) requires the judge to consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." Current empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime and Justice: A Review of Research 28-29 (2006).

Adequate deterrence has already been achieved in this case. The arrest and guilty plea of Mrs. Gold and the co-defendants received publicity in the local community and several new

outlets have written stories concerning the various defendants' misconduct. The deterrent effect has been obtained through the media's coverage of the arrests and sentencings.

Section 3553(a)(2)(C) requires the judge to consider "the need for the sentence imposed . . . to protect the public from further crimes of the defendant." This purpose has to do with both the defendant's risk of recidivism and the danger posed by the defendant, if any. Mrs. Gold is a 38 year old woman who has lived a relatively stable and honest life and is the mother of three small children. She has no history of drug abuse or distribution. Although she has admitted that she tried marijuana one time when she was 20 years old. The role she played in operating the Clinic was that of entrepreneur and business owner. At this stage of her life there is little evidence or information to determine that the public needs protection from Mrs. Gold. Based on her past conduct and role in the instant offense, it is unlikely that she will commit any further crimes.

Section 3553(a)(2)(D) requires the judge to consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Any lengthy prison sentence would not meet the purpose of rehabilitation. A lengthy sentence will disrupt Mrs. Gold's role as a mother, limit her employment prospects, and hinder her ability to take care of her family. This factor would mitigate against any prison sentence.

### 3.    The kinds of sentences available

A review of the potential Guideline range without any variance or downward departure shows Mrs. Gold in Zone D, with an advisory Guideline range of 97 months to 121 months (level 30, criminal history category I). Mrs. Gold's count of conviction is a Class C felony. However, as previously discussed, in light of matters outlined elsewhere in this memorandum,

the Court can determine what sentence is appropriate in Mrs. Gold's case. The Court can impose a term of incarceration in combination with home detention, community service, supervised release, or all of these factors as a part of its sentence.

> **4-5.** **The Kinds of Sentence and the Guideline Sentencing Range Established and any Pertinent Sentencing Commission Policy Statements**

Although the impact of the guidelines on a court's sentencing discretion has been discussed in Section I, supra, the critical question in Mrs. Gold's case is the exact weight this Court should give to the Guidelines. As recognized in *Gall*, district courts "may not presume that the Guidelines range is reasonable." 552 U.S. at 49; *Rita*, 551 U.S. at 351 ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."). Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all but the most unusual cases are now potentially relevant in every case.

Accordingly, this Court can take into account a number of factors in determining Mrs. Gold's sentence, including the extraordinary cooperation shown by Mrs. Gold and her husband in returning to the United States to face these charges and assist the government in prosecuting the co-defendants and other potential cases. These factors are completely ignored in the advisory Guideline range. Such an omission is troublesome when one considers that the Guidelines in Mrs. Gold's case become the baseline for his sentencing. That is, any sentence imposed on Mrs. Gold is seen in the context of how it compares with the applicable Guideline range.

> **6.** **The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**

Prior to the promulgation of the Guidelines, disparity in sentencing was common. *Mistretta v. United States*, 488 U.S. 361, 365 (1989). The Guidelines were designed, in part, to

11

remedy this disparity. "Downward departure to equalize sentencing disparity is a proper ground for departure under the appropriate circumstances." *United States v. Daas*, 198 F.3d 1167, 1180-81 (9th Cir. 1999).

Mr. and Mrs. Gold are the last of the co-conspirators to be sentenced in this matter. The three doctors who were also charged in the instant indictment received sentences of probation. See Judgment as to John Lanning, Doc. No. 220, Judgment as to John Quick, Doc. No. 250, and Judgment as to Rajan Raj, Doc. No. 234. If Mrs. Gold is not sentenced to a substantially similar sentence there will be a significant unwarranted sentencing disparity among the co-defendants in this case. As previously stated, the prescriptions for which each defendant is being held accountable were the result of undercover law enforcement agents being improperly prescribed medications. In each instance, Mrs. Gold could not have been aware that the doctor prescribed medication that was not medically necessary or appropriate.

While Mrs. Gold owned the Clinic, it is important to note that without the doctors the Clinic could not function. Conversely, the doctors, if they had so chosen, could have operated a pain management clinic without Mrs. Gold's assistance. Mrs. Gold operated a business. One in which she relied on the doctors to ensure that the care provided met the appropriate standard of care. She does not have the training, experience, or education to provide medical services to patients. Mrs. Gold relied extensively on the doctors to develop the Clinic's practices and procedures and to determine appropriate medical care for the patients.

Dr. Lanning was the first Medical Director of the Clinic. Dr. Lanning had previously worked for Superior Pain Clinic and was hired by Mrs. Gold and her husband to create the Clinic. In fact, the Clinic was originally opened in Bradenton, Florida pursuant to Dr. Lanning's request. Dr. Lanning lived in Manatee County and wished to open a facility near his home. Dr.

Lanning created and identified the information to be collected from patients through the initial screening process, the forms to be used by the Clinic for patient record keeping and care. The undercover agents provided the Clinic with MRIs and the Clinic's staff obtained the appropriate medical history from each of them. Mrs. Gold had no involvement in the undercover patient's visit, the treatment by Dr. Lanning, and the issuance of a prescription. As far as Mrs. Gold was concerned, the undercover patient provided appropriate records for review by Dr. Lanning and Dr. Lanning's decision to issue a prescription was based on sound medical opinion.

Shortly after opening the Clinic, in the darkness of night, Dr. Lanning took all the patient files and opened a competing pain management clinic in Hillsborough County. On October 14, 2010, Dr. Lanning was arrested and charged with operating a pain management clinic without a license. See *State v. Lanning*, Case No. 10-CM-020467, Thirteenth Judicial Circuit, Hillsborough County, Florida.

After Dr. Lanning absconded with the patient records, Mrs. Gold appointed Dr. Johnathon Quick to act as Medical Director of the Clinic. Dr. Quick remained Medical Director until the Clinic was closed in December 2010. Similarly, Mrs. Gold relied extensively on Dr. Quick to manage and oversee patient care. All patient visits, diagnosis, and treatment recommendations were overseen by Dr. Quick.

Similarly, although not hired as a medical director, Dr. Raj was responsible for the treatment and care of patients he saw. The undercover patients for which Dr. Raj issued prescriptions provided the Clinic with all pertinent medical records. Any lapse in providing reasonable medical care occurred in the treatment room between Dr. Raj and the undercover patient. Mrs. Gold did not assist, direct, or other involve himself with the manner in which Dr. Raj treated patients.

In sum, while each of the doctors played a significant role in operating the Clinic. The defendants are all similarly situated and any sentence imposed that is substantially different than that received by the doctors would lead to an unwarranted sentencing disparity.

### III.   Acceptance of Responsibility

As previously identified in this Memorandum, Mrs. Gold has taken significant steps in addressing and answering for the role she played in running the Clinic. She has acknowledged her wrongdoing and accepted the stipulated facts as alleged in the plea agreement. She and her husband were the first co-defendants to voluntarily plead guilty and it is believed that the other defendants' guilty pleas were in some manner influenced by Golds' willingness to so plead. She also provided all information and evidence in her possession concerning the operation of the Clinic and the use of the funds derived therefrom.

In addition, Mrs. Gold and her husband voluntarily returned to United States to answer the Indictment. Prior to the Indictment being returned, Mrs. Gold and her wife had moved to Russia to live. However, upon learning of the Indictment, they immediately began to make arrangements to return to the United States to resolve this case. Even though it was unlikely the government would have been able to force their return from Russia, the Golds returned.

WHEREFORE, Aigoul Gold, respectfully requests that this Court consider the factors outlined in 18 U.S.C. 3553, her exceptional cooperation in voluntarily returning to the United States, and her substantial assistance, and sentence her to probation in conformity with the co-defendants previously sentenced in this matter.

Dated: April 6, 2015                              Respectfully submitted,


                */s/ Barry A. Cohen*
                BARRY A. COHEN, ESQUIRE
                Florida Bar No.: 0096478
                MICHAEL A. GOLD, LL.M.
                Florida Bar: 71943
                THE COHEN LAW GROUP
                201 E. Kennedy Boulevard, Suite 1950
                Tampa, Florida 33602
                mgold@tampalawfirm.com
                gyacone@tampalawfirm.com
                Attorneys for Defendants

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been furnished by the Court's CM/ECF electronic mail system on this 6th day of April, 2015.

                                                   */s/ Barry A. Cohen*
                                                   BARRY A. COHEN, ESQUIRE
                                                   Florida Bar No.: 0096478